UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HERMAN MENES,

                              Plaintiff,

          -against-

CITY UNIVERSITY OF NEW YORK HUNTER
COLLEGE, et al.,

                              Defendants.

06 Civ. 6358 (RJH)

**MEMORANDUM OPINION
AND ORDER**

        Plaintiff Herman Menes ("Plaintiff") has brought the instant action against his

employer, defendant City of New York Hunter College ("Hunter College"), and six

individuals also employed by Hunter College (collectively, "Defendants").  Plaintiff

asserts (1) that various "religious displays" in the Bursar's Office at Hunter College

constituted a governmental endorsement of religion in violation of the Establishment

Clause of the First Amendment; (2) that Defendants violated his First Amendment rights

by retaliating against him for his complaints about these displays by transferring him to

another position at the college; (3) that Defendants refused to provide him a reasonable

accommodation for a disability in violation of the Rehabilitation Act of 1973

("Rehabilitation Act") and the Americans with Disabilities Act ("ADA"); and (4) that

Defendants engaged in employment discrimination in violation of Title VII of the Civil

Rights Act of 1964 by permitting Plaintiff's co-worker to leave work without loss of pay

or leave time in order to attend church functions while criticizing Plaintiff for leaving

work early.  Plaintiff also asserts various causes of action under the New York State

Constitution and under New York State and New York City Human Rights Laws based

on the same events.[1]  Defendants have moved for summary judgment on all of Plaintiff's claims.

## FACTS

The following summary is based on the parties' Local Rule 56.1 statements and the evidence cited in support of the assertions made therein.  Except as noted, the parties do not dispute the following facts:

**The Hunter College Bursar's Office**

Plaintiff has been employed since 1998 as a College Accountant by Hunter College, a City University of New York senior college.  (Menes Dep. 14.)[2]  Plaintiff was first assigned to the Financial Aid Processing Center and in 2002 was reassigned to the Bursar's Office.[3]  (*Id.* at 14, 17–18, 119, Ex. A; Menes Decl. ¶ 11.)

The Bursar's Office is responsible for, among other things, collecting tuition and fees from Hunter College students, distributing student financial aid checks, and providing customer service to the college's 21,000 students.  (Matis Decl. ¶ 3.)  A

---

[1]  Among Plaintiff's state law claims is a purported cause of action for discrimination on the basis of religion pursuant to the New York State Constitution, Article 1, Section 3.  (Am. Compl. ¶ 84.)  Though, as discussed *infra*, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, it notes that a tort action for violation of state constitutional rights in New York is available only if the plaintiff establishes an entitlement to such a remedy, based on "the private interest that citizens harmed by constitutional violations have an avenue of redress, and the public interest that future violations be deterred."  *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 83 (N.Y. 2001).  Because Plaintiff also seeks relief under New York Human Rights Law, which expressly provides a private right of action for religious discrimination against an employee, recognition of a state constitutional tort is unnecessary.  *Muhammad v. New York City Transit Auth.*, 450 F. Supp. 2d 198, 212 (E.D.N.Y. 2006) (internal quotation marks omitted).

[2]  Plaintiff's deposition transcript is Exhibit C to the August 15, 2007 declaration of Aron Fischer.

[3]  Plaintiff testified at his deposition that he was reassigned to the Bursar's Office because his former supervisor believed that he was completing tax returns on company time.  (Menes Dep. 18–19.)  Plaintiff denied this alleged accusation.  (*Id.*)

College Accountant in the Bursar's Office is required to have the ability to function smoothly in a fast-paced and interactive office. (*Id.* ¶ 11.) When Plaintiff first began working at the Bursar's Office, Matthew LoCurto was the Bursar. (Menes Dep. 18.) In October 2003, Mr. LoCurto was replaced by Theresa Matis. (Matis Decl. ¶ 1; Menes Dep. 32–33.)

**"Religious Displays" in the Bursar's Office**

Plaintiff contends that various displays and activities in the Bursar's Office constituted an unconstitutional endorsement of Christianity by a public entity.

First, Plaintiff's original supervisor, Tom Crowfis, kept a collection of small "statues" or "figurines" of angels on a ledge in his cubicle. (Menes Dep. 32–33, 51, Ex. D; Matis Decl. ¶ 5.) Plaintiff claims that the figurines were visible to anyone entering the Bursar's Department. (Green Decl. Ex. A.) There were no other similar figurines anywhere else in the office. (Menes Dep. 65–66.)

Second, according to Plaintiff, Mr. Crowfis also hung up "religious posters" "all over" the area immediately outside the Bursar's Office. (*Id.* at 52–53, 56.) These posters were allegedly displayed around St. Patrick's Day, Thanksgiving, and Christmas. (*Id.* at 54.) While Plaintiff provides almost no details about these posters,[4] he recalls that they included "images" and "writing" (*Id.* at 51–56), that they had a "Christian religious tone

---

[4] The only specific detail Plaintiff was able to provide at his deposition regarding these posters was that a poster displayed near Thanksgiving, "might have said 'Thanksgiving'." (Menes Dep. 54–55.) He also remembered that the posters did not ask the reader to adopt the Christian religion. (*Id.* at 60.)

and message" (Menes Decl. ¶ 2), and that there was "no doubt that they were Christian religious displays" (Menes Dep. 58–60).[5]

Third, the Bursar's Office held a party each winter at which a Christmas tree and a menorah were displayed. (Crowfis Dep. 12–13, 16–17.)[6] Plaintiff claims that the Christmas tree was on display in the front office "for quite some time before and after Christmas" (Menes Dep. 52, 55–56) and that the menorah was "very old and in disrepair" (*Id.* at 72). Plaintiff attended the party once or twice but then decided not to attend again. (*Id.* at 86–88.) Plaintiff claims that the party had "religious overtones" but could recall no activities that led him to that characterization. (*Id.* at 88–91.)

Finally, Plaintiff claims that, in June 2005, Mr. Crowfis placed a copy of Time magazine, the cover of which featured a photograph of the Pope, on a desk where the office printer was located (Green Decl. Ex. A; Menes Dep. 56–57), and that the magazine

---

[5] Plaintiff claims that, on one occasion, he overheard students complaining about the figurines, the displays, and the Christmas tree. (Menes Dep. 66.) He claims that these students complained about the figurines as they walked past the office window, then entered the Bursar's Office and complained about the figurines, the posters, and the Christmas tree. (*Id.* at 66–69.) Plaintiff claims the students said that they were Jewish and asked "Where are the Jewish displays?" (*Id.* at 67, 71.) Defendants object to these statements as hearsay. If, as Plaintiff proposes, these complaints are interpreted as an assertion by the students that they perceived the displays as "favor[ing] a Christian theme" or "having Christian religious overtones" (Opp'n 4–5), the Court agrees that they are inadmissible hearsay. Plaintiff contends that the students' statements are admissible for this purpose because they fall within the hearsay exception for "present sense impressions." Federal Rule of Evidence 803(1) permits an otherwise hearsay "statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." This exception "applies only to reports of what the declarant has actually observed through the senses." *Brown v. Keane*, 355 F.3d 82, 89 (2d Cir. 2004); *see also Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 233 (2d Cir. 1999) (stating that present sense impressions "express knowledge based on direct sensory perception"). A student's opinion that the displays at issue constituted an endorsement of Christianity does not report a sensory perception or observation but rather the student's own interpretation of these observations. *See, e.g., U.S. v. Guevara*, 277 F.3d 111, 127 (2d Cir. 2001) (upholding district court's determination that statements did not constitute present sense impressions "because they were conclusions based upon information she had processed rather than contemporaneous or spontaneous statements that were inherently trustworthy"). Because the students' alleged complaints are inadmissible hearsay for the purpose for which they are offered, the Court will not consider them in deciding Defendants' motion. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").

[6] Mr. Crowfis's deposition transcript is Exhibit 5 to the declaration of Aaron David Frishberg, filed December 3, 2007.

remained on the desk for months (Menes Dep. 233–34). Plaintiff does not allege that he made any complaints about the magazine while working in the Bursar's Office.[7]

In 2004, Plaintiff first complained to Ms. Matis about Mr. Crowfis's "religious displays." (*Id.* at 32–33; Matis Decl. ¶ 5.) Plaintiff also made complaints to defendant Sharon Neill, the Business Manager at Hunter College, and defendant Laura Schacter, the Dean of Diversity and Compliance. (Menes Dep. 75.) Plaintiff took photographs of Mr. Crowfis's figurines and asked Ms. Matis on various occasions to remove the allegedly religious displays. (*Id.* at 60–63, 70.) Plaintiff stated that Ms. Matis seemed "nonchalant" about his complaints. (*Id.* at 70.) At some point, Ms. Matis told Ms. Neill about the complaints. (*Id.* at 73; Menes Decl. ¶ 5.) Ms. Neill informed Ms. Matis that there was no college policy that prevented employees from displaying religious objects in their own workspace and that Ms. Matis had discretion to set policy regarding such decorations as long as it was evenly applied. (Matis Decl. ¶ 8.) Under Ms. Matis, it was the policy of the Bursar's Office to allow staff to decorate their cubicles with religious or non-religious items as each staff member saw fit; she never asked any employee to remove a decoration from his or her cubicle. (*Id.*)

Plaintiff claims that Ms. Neill, after learning of his complaints, directed that the posters be removed from outside the Bursar's Office, but not from the work area. (Menes Decl. ¶ 5; Menes Dep. 73.) Ms. Neill testified at her deposition that she did not know of

---

[7] In connection with his Establishment Clause claim, Plaintiff also alleged in his Amended Complaint and testified at his deposition that he observed that "many" observant Muslim students attended Hunter College but that "few or none" worked in the Bursar's Office. (Menes Dep. 79–82.) This argument is not mentioned in Plaintiff's opposition papers and is therefore deemed to have been abandoned.

any "religious objects" displayed anywhere other than in individual cubicles and that she never directed anyone to remove any such objects from the office. (Neill Dep. 14–15.)[8]


**Plaintiff's Conflicts With Co-Workers in the Bursar's Office**

   While working at the Bursar's Office, Plaintiff had a number of conflicts with Mr. Crowfis:

   - After his transfer to the Bursar's Office in 2002, Plaintiff became "upset" after he twice requested office and restroom keys from Mr. Crowfis and Mr. LoCurto and did not receive them. (Menes Dep. 17–19, 21–23.) In June 2002, Plaintiff sent a memorandum to Mr. Crowfis and Mr. LoCurto, complaining that he had waited more than three weeks for his keys. (*Id.* at 22–23, Ex. A.)


   - In July 2002, Plaintiff wrote another memorandum to Mr. LoCurto, complaining that Mr. Crowfis had thrown a heavy key ring at him, hitting him on the wrist, after Plaintiff accidentally sat at Mr. Crowfis's desk. (*Id.* at 23–26, Ex. B.) Plaintiff attached documentation to the memorandum indicating that Plaintiff had received a wrist x-ray. (*Id.*)


   - In 2002 or 2003, Mr. Crowfis asked Plaintiff about his plans for getting to work in the event of a transit strike. (*Id.* at 26–27.) Plaintiff responded that he "didn't have to tell him what [his] plans were," but assured him

---

[8] Ms. Neill's deposition transcript is Exhibit F to Aron Fischer's August 15, 2007 declaration.

that he lived in Manhattan and would be at work. *Id.* at 26–28.) Mr.

Crowfis then wrote a letter to Mr. LoCurto complaining about the incident.

(*Id.* at 28.)

- In January 2003, Plaintiff sent a memorandum to Ms. Neill, to whom Ms.

  Matis reported. (Neill Dep. 7–8; Menes Dep. 28–30, Ex. C.) In the

  memorandum, Plaintiff complained that Mr. Crowfis had asked Plaintiff to

  hand a refund check to a student in violation of office policy and reported

  that Mr. Crowfis was not mailing refund checks to students in a timely

  fashion. (Neill Dep. 7–8; Menes Dep. 28–30, Ex. C.)

- Sometime after October 2003, Plaintiff complained to Ms. Matis multiple

  times that Mr. Crowfis spoke loudly on the telephone. (Matis Decl. ¶ 1;

  Menes Dep. 38.)

- In March 2004, Plaintiff sent a memorandum to Ms. Neill complaining

  that Mr. Crowfis had confronted him and accused him of falsely reporting

  the time he had arrived at work. (Menes Dep. 102–04, Ex. F.) Plaintiff

  further stated that Mr. Crowfis had created a "hostile work environment"

  by pitting staff against one another. (*Id.*)

Plaintiff characterized his relationship with Mr. Crowfis as "guarded." (*Id.* at 31–

32.) In April 2004, to reduce the friction between the two, Ms. Matis removed Plaintiff

from Mr. Crowfis's supervision and asked Plaintiff to report directly to her. (Matis Decl. ¶ 4.)

Other employees in the Bursar's Office also complained about Plaintiff's behavior. One co-worker, Joseph D'Auria, complained to Ms. Matis about Plaintiff's criticism regarding his work habits. (Menes Dep. 41–43.) Plaintiff claims that the comments were an "attempt at humor," and that, upon learning of Mr. D'Auria's complaint, he apologized and resolved their misunderstanding. (*Id.*) On another occasion, during a disagreement over an office procedure, Plaintiff pointed out that he had a higher job title than co-worker Jennifer Sagnelli. (*Id.* at 39–40.) Ms. Sagnelli complained to Ms. Matis about this incident. (Matis Decl. ¶ 10.) According to Plaintiff, he and Ms. Sagnelli "had [their] differences . . . but got along well." (Menes Dep. 39.) Ms. Matis stated in her declaration that other employees had made similar complaints to her about their conflicts with Plaintiff. (Matis Decl. ¶ 10.)

**Plaintiff's 2004 Performance Evaluation**

On or around April 1, 2005, Ms. Matis gave Plaintiff his annual performance evaluation for his work in 2004. (*Id.* ¶ 13.) Plaintiff received an overall "satisfactory" rating but the evaluation indicated that he "[n]eeds improvement in attitude and manner," though it also stated that his "attitude has improved since reporting directly to the Bursar." (*Id.* ¶ 13, Ex. D.) Plaintiff wrote Ms. Matis to request that this comment be "withdrawn" from his evaluation until he had an opportunity to respond. (*Id.* ¶ 14, Ex. E.). Plaintiff then requested a meeting with Ms. Neill, which took place on June 20, 2005 and was attended by Plaintiff, Ms. Neill, Ms. Matis, a representative from Human

Resources, and Ms. Sagnelli, acting as a union representative whom Plaintiff requested to attend as an "observer." (Menes Dep. 114–15.) Ms. Sagnelli took minutes for the meeting. (Frishberg Decl. Ex. 4.)

Plaintiff contends that Ms. Neill began the meeting by referring to him as a "troublemaker." (Menes Dep. 117; Green Decl. Ex. A.) During the meeting, Plaintiff asked Ms. Neill to reveal the basis for the comment in his evaluation regarding his "attitude and manner." (Frishberg Decl. Ex. 4.) Ms. Matis stated that Plaintiff has had problems with Mr. Crowfis and with almost everyone in the office. (*Id.*) Plaintiff acknowledged his conflict with Mr. Crowfis and said he had a problem with Mr. Crowfis's "demeanor and supervision." (*Id.*) He complained that Mr. Crowfis was never at his desk and was always taking personal phone calls and socializing. (*Id.*) He stated that he could not work because Mr. Crowfis made the environment "terrible." (*Id.*) Plaintiff also noted that he had previously complained to Ms. Matis about Mr. Crowfis's religious articles displayed at his desk and about the Christmas decorations Mr. Crowfis hung up around the office. (*Id.*) Plaintiff said that these complaints were not related to his personal feelings about Mr. Crowfis but were about the display of Christian religious objects in a public university. (*Id.*) Plaintiff opined that "the decorations are out of proportion" and that "Ms. Neill should create a standard that's appropriate." (*Id.*) Plaintiff then complained about being subjected to "religious banter" as well as Mr. Crowfis's personal phone calls. (*Id.*) Ms. Matis noted that whenever she had answered Mr. Crowfis's phone, the calls were business related, but that she had received complaints about Plaintiff's personal phone calls. (*Id.*) At the conclusion of the meeting,

Plaintiff was told that the negative comment in his evaluation would not be removed but that he was entitled to submit a written response. (Matis Decl. ¶ 15.)

The day after the meeting, Ms. Matis wrote an email to Ms. Neill requesting that she consider reassigning Plaintiff to "another area where he could use his 'accounting skills' more and work in a quiet environment where there is little conversation and less pressure to deal with students." (*Id.* ¶ 16, Ex. F.) Ms. Matis noted numerous problems with Plaintiff's behavior, including his conflicts with Mr. Crowfis, which she characterized as a "personal vendetta" against Mr. Crowfis and which had "reached a level that has affected the entire office." (*Id.* Ex. F.) She further noted, among other things, that Plaintiff left work early, that employees had observed him watching television in campus lounges, that he had been involved in conflicts with five other employees, that he refused to answer the office telephones, and that staff members had complained about his loud personal phone conversations. (*Id.*) She explained that the confrontations with other employees were making it difficult to provide adequate service to students and that, in the Bursar's Office, "it is critical that [the] staff work together to provide quality service to students. This means that EVERYONE must do whatever it takes to get the job done when the office is busy." (*Id.*)

**Plaintiff's Transfer to the Accounting Department**

During 2005, the Hunter College Accounting Department was under increased staffing demands due to new duties that had been assigned to that department. (Cangemi Dep. 8–9;[9] Neill Dep. 18–19.) In the Accounting Department, most employees work individually on accounting projects; work-related interaction between employees is

---

[9] Livia Cangemi's deposition transcript is Exhibit E to the August 15, 2007 declaration of Aron Fischer.

limited and the department does not provide customer service to the general student body. (Cangemi Decl. ¶ 3.)

In September 2005, Ms. Neill reassigned Plaintiff to the Accounting Department. (Neill Dep. 15–16; Menes Decl. ¶ 11.) She made this decision after discussions with Ms. Matis regarding Plaintiff's behavior and failure to provide necessary service and support in the office, and with Livia Cangemi, the Accounting Director, regarding additional staffing needs in the Accounting Department. (Neill Dep. 17–19; Cangemi Decl. ¶¶ 5–6.)

Following his transfer, Plaintiff was under the supervision of Ms. Cangemi. (Menes Decl. ¶ 13; Cangemi Decl. ¶ 28.) Ms. Cangemi asked Plaintiff to perform tasks that required the use of the computer program Microsoft Excel. (Menes Dep. 120–21, 130–33.) Plaintiff was not able to complete these tasks, at least initially, due to his unfamiliarity with this program. (*Id.* at 130–33.) Ms. Cangemi asked Plaintiff to take a free school-sponsored course on Excel; Plaintiff attended this course but told Ms. Cangemi that he did not find it helpful.[10] (*Id.* at 127–28, 133–34; Cangemi Decl. ¶ 7.) Ms. Cangemi gave Plaintiff some easier assignments and asked other staff if they had tasks on which Plaintiff could assist. (Cangemi Decl. ¶ 8.) Ms. Cangemi observed that Plaintiff responded uncooperatively upon receiving work assignments, took excessive amounts of time to complete them, and made so many errors that his work routinely had to be redone. (*Id.*) Several members of the staff asked not to work with him, stating that they could complete their work more quickly without his assistance.[11] (*Id.*) Plaintiff

---

[10] Plaintiff claims that he enrolled in an eight-hour course on Excel in March and April 2006 on his own time and at his own expense. (Menes Decl. ¶ 27, Ex. 3.)

[11] Attached to Ms. Cangemi's declaration is an August 31, 2006 memorandum addressed to Ms. Neill and signed by nine Accounting Department staff members requesting that Plaintiff be transferred out of the Accounting Department, citing his loud personal phone conversations, his disregard for his "coworkers'

claims that he was eventually able to complete some of the less complicated tasks using Excel. (Menes Dep. 133–35.)

In November of 2005, Plaintiff left the Accounting Department during work hours to visit the Bursar's Office and attempt to take photographs of Mr. Crowfis's figurines in an attempt to prove that the figurines could be seen from outside the office. (*Id.* at 147–53.) According to Plaintiff, he met shortly afterwards with Robert McGarry, the director of human resources, who told Plaintiff that he was not to go near the Bursar's Office until Mr. McGarry completed an investigation into the incident. (*Id.* at 150–51.) However, Plaintiff returned again in December, allegedly to drop off information regarding contributions for a former co-worker who was serving in Iraq. (*Id.* at 153–55.) Plaintiff could not remember whether the December visit was made during work hours or during his lunch break. (*Id.* at 156–63, 173–75.)

In early 2006, Ms. Cangemi gave Plaintiff a "special evaluation" indicating an overall "unsatisfactory" performance and indicating several specific areas in need of improvement. (Cangemi Decl. ¶ 10, Ex. B.) According to Ms. Cangemi, "special evaluations are used to notify underperforming employees quickly that their performance needs improvement." (*Id.* ¶ 10.) Ms. Cangemi had never before given an overall "unsatisfactory" evaluation to an employee. (Cangemi Dep. 25.) Plaintiff had previously received "satisfactory" evaluations from his supervisors in the Financial Aid Processing Center and the Bursar's Office for his work performed in 1998, 1999, 2001, and 2004. (Frishberg Decl. Ex. 1.)

---

feelings, workload, or environment," and his "unwillingness to work as a team member." (Cangemi Decl. Ex. A.)

The evaluation stated that Plaintiff "exhibited great difficulty in learning tasks and carrying out his assignments," "had to be repeatedly retrained on basic accounting tasks," "makes careless errors on" his spreadsheets, "disrupts the other employees" because he speaks loudly and is "often on the phone with personal business," refuses to receive instruction, "doesn't follow directions," "fails to meet deadlines," "has demonstrated difficulty in learning basic job tasks," "lack computer skills but refuses to take additional classes," and "frequently leaves early for doctor appointments." (Cangemi Decl. ¶ 10, Ex. B.)

In early 2006, Ms. Cangemi assigned Plaintiff to work exclusively with a senior member of the Accounting Department staff, Kathleen Griffith, after Ms. Cangemi noticed that Ms. Griffith had "an exceptional amount of patience with [Plaintiff]." (*Id.* ¶ 11; Menes Dep. 141.) Plaintiff reports that working with Ms. Griffith has reduced his stress at work. (*Id.* at 141–42.)

**Plaintiff's Requests for a "Reasonable Accommodation"**

Plaintiff sent a memorandum dated September 27, 2005 to a number of individuals including defendant Tamara Green, a Hunter College Professor and the Section 504/ADA Commissioner. (Green Decl. ¶¶ 1–3.) As the Section 504/ADA Commissioner, Dr. Green responds to requests by students or staff for disability accommodations. (*Id.* ¶ 2.) In Plaintiff's memorandum, he described his meeting with Ms. Matis and Ms. Neill and wrote that he believed he had been transferred to the Accounting Department in retaliation for his complaints about the "religious articles and pictures on display in the Bursar's Office." (*Id.* ¶ 3, Ex. A.) Plaintiff also stated that the

transfer had caused him great anxiety and "negatively affected his health." (*Id.* Ex. A.) He wrote that he had a "history of clinical depression and hospitalization" and that some of his doctors had diagnosed him with a "medical disability." (*Id.*) He requested Ms. Green's assistance in returning to his old job, and, "if necessary," a "reasonable accommodation." (*Id.*)

In October 2005, Plaintiff met with Ms. Green to discuss his request. (*Id.* ¶ 4; Menes Dep. 186–90.) Ms. Green told Plaintiff that in order to demonstrate that he was entitled to a disability accommodation, he would need to submit a letter from a physician describing the nature of his disability, explaining how it impaired his ability to perform his work and/or other life functions, and explaining how a workplace accommodation would alleviate that impairment. (*Id.* ¶ 7.) In late November or early December 2005, Plaintiff delivered a letter to Ms. Green from a physician named Dr. Carolyn Rodriguez; the letter stated that Plaintiff had "a medical condition for which he is being treated under [her] care." (*Id.* ¶ 7, Ex. C.) Ms. Green met with Plaintiff soon afterwards and told him that the letter was insufficient because it failed to describe any disability or accommodation. (*Id.* ¶ 7.)

On January 19, 2006, Plaintiff submitted another letter from Dr. Rodriguez, which indicated that Plaintiff had a "psychiatric condition," and was being treated for "[a]djustment disorder with depressed mood and anxiety," but again did not state how this condition affected him or what sort of accommodation might be appropriate. (*Id.* ¶ 8.) Ms. Green met with Plaintiff again and explained that he needed to provide more information about his need for an accommodation. (*Id.* ¶ 8; Ex. C.)

Plaintiff did not respond with any additional information.  (*Id.* ¶ 9.)  However, in a letter to Ms. Green dated March 1, 2006, Plaintiff again requested a "reasonable accommodation of [his] psychiatric disability."  (*Id.* ¶ 9, Ex. E.)  He stated that he had "taken sick and annual leave to recover [his] ability to work after the increasingly tense and humiliating supervision [he] experienced after being reassigned to the Accounting Department."  (*Id.* Ex. E.)  He requested reassignment either to his old job or to a different job under a new supervisor, but stated that, if he must remain working at the Accounting Department, he needed "additional time to learn the job, respectful treatment by [his] supervisor, and no harassment."  (*Id.*)  He explained that his request was based on his belief that it was in both the college's and his own best interest and further claimed that the request was supported by his psychiatrist.  (*Id.*)

Mr. McGarry responded in a letter dated May 1, 2006, which stated that the information Plaintiff had provided was not sufficient to support his request for an accommodation.  (Menes Dep. 199–204; Menes Decl. ¶ 35; Green Decl. Ex. E.)  The letter informed Plaintiff that it would be possible to make a determination regarding his request after he provided a letter from a physician "that fully describes your disability and related work limitations as well as major life activity limitations," and "evaluate[s] your work limitations in relation to your job as a College Accountant."  (Green Decl. Ex. E.)  Attached to the letter was a copy of Plaintiff's job description.  (Menes Decl. ¶ 35; Green Decl. Ex. E.)

Plaintiff then withdrew his request for an accommodation, stating that it was no longer necessary.  (Menes Dep. 204–05; Menes Decl. ¶ 36.)[12]

---

[12]  Plaintiff asserts in his motion papers that he submitted a letter from another psychiatrist, Dr. David Weng, and attaches a copy of a handwritten letter apparently from Dr. Weng dated June 8, 2006.

**Defendants' Alleged Favorable Treatment of Mr. Crowfis**

Plaintiff's cause of action for employment discrimination is based on Plaintiff's contention that Mr. Crowfis was permitted to leave work to attend religious functions without loss of pay and without using leave time, while Plaintiff was reprimanded for leaving the office during work hours. (*See* Am. Compl. ¶ 77.)

Plaintiff claims that Mr. Crowfis left the office during work hours to attend church activities, specifically activities related to his position as director of the bereavement committee at his church. (Menes Dep. 210–11.) In support of this claim, Plaintiff cites his observations that Mr. Crowfis "seemed to leave work whenever he felt like it" and that Mr. Crowfis sometimes came to work dressed for a funeral. (*Id.* at 208, 210–14.) Plaintiff believes that Mr. Crowfis did not use official leave time when he left work to attend church functions because Mr. Crowfis also used three or four week blocks of leave time to travel and therefore would not have sufficient leave time available to use for church functions. (*Id.* at 214–17.)

Plaintiff testified that he had never seen documentation regarding Mr. Crowfis's leave time. (*Id.* at 216) However, Leave Request Forms submitted by Mr. Crowfis indicate that, between January 2002 and January 2004, Mr. Crowfis made at least seven requests to use his annual leave time in one to two hour increments. (Matis Decl. ¶ 7, Ex. C.) Though Mr. Crowfis was not required to provide the reasons for the request, at least six of these requests indicate that the reason for the request was to attend a funeral or

(Frishberg Decl. Ex. 2.) The letter reports that Plaintiff "has a diagnosis of major depression," that his symptoms occurred in August 2005 "due to conflict with supervisor and transfer to another office," that his "symptoms have reduced [sic] in the past two months due to less scrutiny at work." (*Id.*) The letter concluded by stating, "It will be helpful for Mr. Menes to have reduced stressed [sic] at work to improve his mental health." (*Id.*) This letter is not authenticated, nor does Plaintiff cite any evidence indicating that a copy of this letter was provided to Ms. Green, Mr. McGarry, or anyone else at Hunter College.

church service.  (*Id.*)  According to Ms. Matis, who claims to personally observe Mr. Crowfis's attendance, Mr. Crowfis is "scrupulous" about requesting and using leave time when he leaves the office during regularly scheduled work hours and has never been absent from the office without leave.  (*Id.* ¶¶ 6, 7.)

In her June 21, 2005 letter to Ms. Neill requesting Plaintiff's transfer out of the Bursar's Office, Ms. Matis mentioned that Plaintiff leaves the office early each night, most days at 4:55 p.m.  (*Id.* Ex. F.)  Plaintiff's "special evaluation" rated Plaintiff's attendance and punctuality as "[g]enerally acceptable," but noted that he frequently left work early for medical appointments.  (Cangemi Decl. Ex. B.)[13]

Plaintiff never made a request to leave work for religious purposes or for any accommodation for a religious practice.  (Menes Dep. at 217–18.)  Plaintiff did not recall any time that he was denied permission to leave early when he requested to do so.  (*Id.* at 207–08.)  Plaintiff does not know if any other employees asked for permission to leave work for religious purposes.  (*Id.* at 217.)

## DISCUSSION

### I.      Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[A]ffidavits shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall

---

[13]  The evaluation indicated that Plaintiff had provided notes for most of these absences.  (Cangemi Decl. Ex. F.)

show affirmatively that the affiant is competent to testify to the matters stated therein." *Id.* 56(e). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In deciding a motion for summary judgment, the court may consider, in addition to affidavits, other evidence that would be admissible at trial. *See, e.g., Universal Film Exchs., Inc. v. Walter Reade, Inc.*, 37 F.R.D. 4, *5–6 (S.D.N.Y. 1965) ("It is the policy of Rule 56(e) to allow the affidavit to contain evidentiary matter which, if the affiant were in court, would be admissible as a part of his testimony.") (quoting *Am. Securit Co. v. Hamilton Glass Co.*, 254 F.2d 889, 893 (7th Cir. 1958)); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) ("On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial.").

The moving party can satisfy its burden by showing that the opposing party is unable to establish an element essential to that party's case and on which that party would bear the burden of proof at trial. *See Celotex*, 477 U.S. at 321; *Gallo v. Prudential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). Indeed, summary judgment is "mandated" when "the

evidence is insufficient to support the non-moving party's case." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 61 (2d Cir. 1998).

If the moving party meets its burden, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322–23. An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no genuine issue of material fact." *Liberty Lobby*, 477 U.S. at 247–48. Specifically, the non-moving party cannot rely on mere allegations, denials, conjectures, or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *See id.* at 256–57; *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) ("[A] party cannot defeat summary judgment merely by providing "conclusory statements, conjecture, or speculation."); *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 902 (1990) ("[C]onclusory allegations unsupported by specific evidence will be insufficient to establish a genuine issue of fact." (internal quotation marks omitted)).

## II.        Plaintiff's Establishment Clause Claim

Plaintiff asserts that Defendants violated the Establishment Clause by (1) permitting Mr. Crowfis to keep figurines of angels at his cubicle; (2) permitting Mr. Crowfis to place a magazine with a cover photo of the Pope next to the office printer; (3) permitting Mr. Crowfis to post Christian-themed holiday posters in the office; (4) holding a seasonal holiday party; (5) displaying a Christmas tree while displaying a menorah that

was "very old and in disrepair"; and (6) permitting Mr. Crowfis to take time off for religious functions without using leave time.[14] Plaintiff alleges that, in combination, these various actions would lead a reasonable observer to believe that Hunter College was favoring Christianity.

### A. Legal Standard

"[T]he Establishment Clause prohibits government from officially preferring one religious denomination over another." *Skoros v. City of New York*, 437 F.3d 1, 16 (2d Cir. 2006) (citing *Larson v. Valente*, 456 U.S. 228, 244 (1982)). Establishment Clause challenges in this Circuit are analyzed under the three-part analysis introduced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See Skoros*, 437 F.3d at 17 & n.13 (noting that though the *Lemon* test has been criticized, it has never been specifically disavowed by the Supreme Court, and continues to govern Establishment Clause challenges in the Second Circuit). "[G]overnment action that interacts with religion (1) 'must have a secular . . . purpose,' (2) must have a 'principal or primary effect . . . that neither advances nor inhibits religion,' and (3) 'must not foster an excessive government entanglement with religion.'" *Id.* at 17 (quoting *Lemon*, 403 U.S. at 612–13.) It is Plaintiff's burden to prove that the challenged policies violate the Establishment Clause. *See, e.g., Curran v. Lee*, 484 F.2d 1348, 1350 (2d Cir. 1973).

---

[14] In Plaintiff's Amended Complaint, Plaintiff also alleged that some of these actions created a "religiously hostile work environment." (Am. Compl. ¶ 22.) Because Plaintiff has not addressed this claim in his opposition papers, it is deemed abandoned.

**B.      Plaintiff Has Not Shown That Defendants Acted With A Non-Secular Purpose**

The requirement of a secular purpose means that government may not "abandon[] neutrality and act[] with the intent of promoting a particular point of view in religious matters." *Skoros*, 437 F.3d at 18 (quoting *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987)). In determining the purpose of the challenged action, the Court considers whether an "objective observer," "tak[ing] account of the traditional external signs" indicative of purpose, would view the government as acting with the intent of promoting a particular religious viewpoint. *McCreary County, Ky. v. Am. Civil Liberties Union of Ky.*, 545 U.S. 844, 862 (2005).

There is no evidence from which an objective observer could conclude that any of the challenged policies had a non-secular purpose. The undisputed evidence is that Ms. Matis permitted all staff to decorate their cubicles with religious or non-religious items as they wished. (*See* Matis Decl. ¶ 8.) With respect to the Time magazine cover, Plaintiff offers no evidence that any defendant knew about or approved this display. Plaintiff's conclusory assertion that posters displayed in the office conveyed a "Christian religious tone and message" does not raise an issue of material fact regarding a non-secular purpose of this display. In any case, Plaintiff does not contend that employees were not permitted to hang up posters with non-Christian messages or that Defendants favored posters with Christian themes. Plaintiff offers no evidence regarding any aspect of the holiday party that could be construed as endorsing religion. Plaintiff's claim that the menorah displayed in the office was "very old and in disrepair" is conclusory and does raise an issue of material fact regarding a non-secular purpose of this display. Finally, as discussed in more detail *infra*, Plaintiff has offered no evidence indicating that any

defendant permitted Mr. Crowfis to leave work for religious functions without using leave time.

Because Plaintiff has failed to offer evidence that any action or policy of any defendant, whether considered individually or in the aggregate, was undertaken with a non-secular purpose, The Court grants Defendants' motion for summary judgment with respect to Plaintiff's Establishment Clause claim.

### III.    Plaintiff's First Amendment Retaliation Claim

Plaintiff contends that he was transferred from the Bursar's Office to the Accounting Department in retaliation for his complaints about the allegedly religious displays in and around the Bursar's Office.

"In order to survive a motion for summary judgment on a First Amendment retaliation claim, a plaintiff must bring forth evidence showing that he has engaged in protected First Amendment activity, he suffered an adverse employment action, and there was a causal connection between the protected activity and the adverse employment action."  *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007).  "[T]he causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action."  *Cotarelo v. Village of Sleepy Hollow Police Dept.*, 460 F.3d 247, 251 (2d Cir. 2006).  If a plaintiff offers sufficient evidence on each of these three elements, his claim should not be dismissed on summary judgment "unless the defendant establishes as a matter of law that he would have taken the same adverse employment action even absent the protected conduct."  *Id.*

### A. Matter of Public Concern

If Plaintiff's complaints "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for us to scrutinize the reasons for [his] discharge." *Connick v. Myers*, 461 U.S. 138, 146 (1983). According to Plaintiff, his complaints to Ms. Matis expressed his belief that "the display of religious objects in common areas at a public institution was inappropriate and that [he] had overheard some Jewish students voicing their discomfort with these displays." (Menes Decl. ¶¶ 2–3.) The minutes from the June 11, 2005 meeting note Plaintiff's comments that "the [Christmas] decorations are out of proportion" and that "Ms. Neill should create a standard that's appropriate." (*Id.* Ex. 4.)

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff's speech can be construed as addressing a matter of public concern. A reasonable factfinder could conclude that Plaintiff was expressing not only his personal aversion to the displays and to Mr. Crowfis but also his opinion that the displays constituted an unconstitutional endorsement of Christianity by a public institution. Setting aside the merits of this contention, it touches on a matter of public concern. *See, e.g., Connick*, 461 U.S. at 146 (noting that a plaintiff's statements regarding a school district's allegedly racially discriminatory policies involved a matter of public concern).

### B. Adverse Employment Action

An "adverse employment action" in this context is one that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dillon*, 497 F.3d at 254 (quoting *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217,

225 (2d Cir. 2006)).  Plaintiff contends that his transfer to the Accounting Department was an adverse employment because (1) Plaintiff's assignments in the Accounting Department required him to use Microsoft Excel, a program he was unable to use, and (2) he received a negative special evaluation "for not showing mastery of those [Excel] skills" after receiving at least four "satisfactory" evaluations in the seven years he worked in the FAPC and the Bursar's office.[15]  (Opp'n 10–11).

"'[W]hether an undesirable employment action qualifies as being "adverse" is a heavily fact-specific, contextual determination.'"  *Zelnik*, 464 F.3d at 226 (quoting *Hoyt,* 433 F.3d at 328).  "A plaintiff cannot support such a determination unless he can show that an alleged act of retaliation is more than de minimis."  *Id.*  The Court does not believe that a jury could conclude that a transfer from the Bursar's Office to the Accounting Department would deter a person "of ordinary firmness" from exercising his or her First Amendment rights under similar circumstances.  Plaintiff has not demonstrated that he suffered negative consequences from his unfamiliarity with Microsoft Excel.  Rather, the undisputed evidence indicates that the only consequences of his inability to use Excel were that he was asked to take a free course to learn the program and that he received less complicated assignments.  (Cangemi Decl. ¶¶ 7, 8; Menes Dep. 132–35.)  Plaintiff's special evaluation did not criticize his lack of computer skills but rather his refusal to make an effort to learn such skills.  (Cangemi Decl. Ex. B.) Plaintiff does not contend that he is incapable of learning how to use Excel, only that he did not find the school-sponsored course to be helpful, for reasons which are unclear. (Menes Dep. 133–34.)  There is no evidence that Plaintiff made any further effort to learn

---

[15]  In his opposition brief, Plaintiff claims that, prior to his transfer, his evaluations were "never less than satisfactory."  (Opp'n 10.)  However, Plaintiff has only provided evaluations from 1998, 1999, 2001, and 2004.  (Frishberg Decl. Ex. 1.)

Excel until March 2006, when he claims to have enrolled in another course. (Menes Decl. ¶ 27, Ex. 3.) However, Plaintiff testified that he eventually learned how to complete bank reconciliations using Excel and that he is now able to use Excel to successfully complete tasks for Ms. Griffith. (Menes Dep. 133–34, 140–41.) The Court finds that Plaintiff's transfer to a position that required him to learn how to use a new computer program imposed at most a de minimis burden and does not constitute an adverse employment action.

With respect to Plaintiff's January 2006 special evaluation, Plaintiff has offered no evidence that he suffered any negative consequences from this evaluation. Rather, the evidence indicates that the special evaluation is used "to notify underperforming employees quickly that their performance needs improvement." (Cangemi Decl. ¶ 10.) Plaintiff was not demoted or otherwise penalized or disadvantaged as a result of this evaluation and, at least at the time of his deposition in April 2007, still worked in the Accounting Department at Hunter College. (Menes Dep. 140–41.) While under some circumstances a negative performance evaluation might conceivably constitute an adverse employment action, the evidence indicates that Plaintiff's January 2006 special evaluation injured only Plaintiff's pride. *Cf. Zelnik.*, 464 F.3d at 224–29 (holding that denial of "honorific" professor emeritus status was not an adverse employment action where such title did not entitle the plaintiff "to any benefit or item of value beyond what is afforded to other retired faculty members").

## C.    Causal Connection

The required causal connection between protected speech and an adverse employment action only exists if the defendant or defendants responsible for the action "directly participated" in the unlawful action. *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005). "In a retaliation case, an employer's state of mind is necessarily at issue." *Id.*; *see also Crawford-El v. Britton*, 523 U.S. 574, 585 (1998) (listing First Amendment retaliation as an example of a "claim[ ] for which an official's motive is a necessary element"). Therefore, "'[D]irect participation' . . . in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Gronowski*, 424 F.3d at 293 (quoting *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir. 2001)).

Even if there were evidence sufficient to find that Plaintiff's transfer constituted an adverse employment action, the necessary "causal connection" is absent here, where there is no evidence that Ms. Matis or Ms. Neill knew that Plaintiff's new position would require computer skills that Plaintiff did not possess, and there is no evidence that either defendant had any role in the negative evaluation he received post-transfer or could have foreseen that he would receive such an evaluation. As Plaintiff himself emphasizes, Ms. Cangemi had never issued an unsatisfactory evaluation prior to her January 2006 special evaluation for Plaintiff.

Plaintiff's allegation that he was transferred "for the purpose of setting him up for failure" (Opp'n 10) is without any support in the record. Plaintiff purports to dispute the stated reasons for the transfer, alleging that Ms. Cangemi was a probationary employee at the time of his transfer and that Ms. Matis and Ms. Neill transferred him as a "fist [sic]

step toward effectuating his dismissal, in reprisal for his complaints about the religious displays, by placing him under the supervision of an employee who had to satisfy Sharon Neill if she was to keep her own job." (Pl.'s Rule 56.1 Response ¶ 26.) The deposition testimony Plaintiff cites in support of this claim indicates only that Ms. Cangemi started working as the Accounting Director at Hunter College in June 2005 and reported to Ms. Neill in this position. (Cangemi Dep. 7.) Plaintiff cites no evidence that even remotely suggests that Ms. Neill or Ms. Matis orchestrated, encouraged, or even knew about, Plaintiff's allegedly adverse treatment.

Furthermore, the only evidence offered by Plaintiff to support a causal connection between his speech and his transfer is (1) the fact that Ms. Matis formally requested Plaintiff's transfer one day after his meeting with Ms. Matis and Ms. Neill at which his complaints about the "religious displays" were mentioned, and (2) his allegation that Ms. Neill called him a "troublemaker" at the beginning of that meeting. While temporal proximity between protected speech and an adverse employment action may in some cases support an inference of a causal connection, no such inference can be drawn in the instant case. *See, e.g., Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'"). It is undisputed that Plaintiff had made these complaints repeatedly since 2004 and that both Ms. Matis and Ms. Neill were aware of the complaints prior to the meeting. Furthermore, Plaintiff's concern about Mr. Crowfis's "religious displays" was not the only topic discussed at the meeting. Plaintiff also voiced his dissatisfaction with Mr.

Crowfis's demeanor, supervision, and behavior, including his personal telephone calls, socializing, and amount of time spent at his desk. The group also discussed Plaintiff's conflicts with other coworkers.

Plaintiff's claim that Ms. Neill called him a "troublemaker" at the beginning of the meeting likewise does not suggest that his transfer was motivated by Plaintiff's protected speech. There is no evidence from which to infer that this comment referred to Plaintiff's complaints regarding "religious displays" in the office, as opposed to, for example, his demand for a formal meeting with the Bursar and Business Director of the college to dispute a comment in his annual evaluation. Indeed, according to Plaintiff, this comment was made at the beginning of the meeting, before any discussion of these complaints.

Finally, Ms. Matis's letter to Ms. Neill formally requesting Plaintiff's transfer made no mention of Plaintiff's complaints regarding the displays, but rather focused on Plaintiff's disruptive conflicts with other co-workers, including a "personal vendetta" against Mr. Crowfis, his loud personal phone calls during work hours, his refusal to answer the telephones, and his habit of leaving the office before 5:00 p.m. each night.

"The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). Even accepting all of Plaintiff's evidence and resolving all doubts in his favor, no such inference is possible here.

Because Plaintiff has not presented evidence to support necessary elements of his claim, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's First Amendment retaliation claim.[16]

## IV.  Plaintiff's Rehabilitation Act and ADA Claims

Plaintiff has asserted claims under the Rehabilitation Act and the ADA arising out of Defendants' alleged refusal to provide a "reasonable accommodation" for a disability. Plaintiff appears to base this claim on Defendants' failure to transfer Plaintiff back to the Bursar's Office or otherwise modify his work conditions to relieve the stress and/or depression he claims to have experienced in his new position in the Accounting Department.

### A.  Legal Standard

Both the Rehabilitation Act and the ADA prohibit covered employers from discriminating against an otherwise qualified employee because of his or her disability. *See* 42 U.S.C. § 12112(a); 29 U.S.C. § 794(a).[17]  Under each statute, an employer is

---

[16]  Plaintiff's Amended Complaint also asserts a cause of action for retaliation based on the New York State Constitution, Article 1, Section 8.  As discussed *infra*, the Court declines to exercise supplemental jurisdiction over this claim.  However, freedom of speech claims are subject to the same analysis under the federal and New York State Constitutions.  *See, e.g., Hanig v. Yorktown Cent. Sch. Dist.*, 384 F. Supp. 2d 710, 722 n.10 (S.D.N.Y. 2005); *Sanchez v. Turner*, No. 00 Civ. 1674, 2002 WL 1343754, at *4 n.4 (S.D.N.Y. June 19, 2002).  In light of the foregoing analysis of Plaintiff's federal constitutional claim, the Court has serious doubts about whether Plaintiff would be acting in good faith if he were to pursue this claim in state court.

[17]  The ADA prohibits covered entities from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ."  29 U.S.C. § 794(a).

required to provide a "reasonable accommodation to the known physical or mental limitations" of such an employee unless such accommodation "would impose an undue hardship on the operation" of the employer's business or program. 42 U.S.C. § 12112(b)(5)(A); 45 C.F.R. § 84.12(a). Terms common to the Rehabilitation Act and ADA schemes are to be given the same meaning. *See Stone v. City of Mount Vernon*, 118 F.3d 92, 96 (2d Cir. 1997).

> [A] plaintiff can establish a prima facie case under either statute by showing (1) that he is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of his disability, (3) that with reasonable accommodation, he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations.

*Id.* at 96–97.

An individual is considered "disabled" if he suffers from "a physical or mental impairment that substantially limits one or more of the major life activities," has "a record of such an impairment," or is "regarded as having such an impairment." *See* 42 U.S.C. § 12102(2). An impairment that "substantially limits . . . major life activities" is one "that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002).


### B.      Plaintiff Has Not Offered Evidence of a Disability

It is not entirely clear what Plaintiff contends to be his "disability." The only specific diagnosis in the materials submitted in support of his request is that of "adjustment disorder with depressed mood and anxiety." Dr. Weng's letter, which Plaintiff does not contend was ever submitted to anyone at the college, states that

Plaintiff suffered from major depression. However, "[i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those 'claiming the Act's protection . . . to prove a disability by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial.'" *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002) (quoting *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999)). Plaintiff has offered no evidence indicating that his adjustment disorder, depression, or any other condition limited any "major life activity." Plaintiff seems to argue that his transfer and his experience in the Accounting Department caused him stress and contributed to his depressive symptoms. However, there is no evidence of the severity of these symptoms or the extent to which they interfered with any major life activities.

Plaintiff's Rehabilitation Act and ADA claims fail even if interpreted as asserting that Plaintiff is substantially limited in the major life activity of "working." To do so, a Plaintiff must show that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* At most, Plaintiff has offered evidence that he took sick and leave time due to stress and depression. (Menes Decl. ¶ 37.) Plaintiff has offered no evidence that any disability rendered him unable to perform a "class of jobs or broad range of jobs" as required to establish a substantial limitation in "working."

Because Plaintiff has not provided evidence of a "disability," the Court grants Defendants' motion for summary judgment with respect to Plaintiff's Rehabilitation Act and ADA claims.

## V. Plaintiff's Employment Discrimination Claim

### A. Legal Standard

"The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff. In other words, is the employer . . . treating some people less favorably than others because of their race, color, religion, sex, or national origin." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (internal citations and quotation marks omitted).

To survive summary judgment, Plaintiff "must first establish a prima facie case by demonstrating that: (1) [he] is a member of a protected class; (2) [his] job performance was satisfactory; (3) [he] suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir.2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

### B. Adverse Employment Action

Plaintiff has not made out a prima facie case of discrimination because he has not submitted any evidence of the alleged adverse employment action—the differential treatment of employees' absence from work. Plaintiff asserts that Defendants engaged in employment discrimination by allowing Mr. Crowfis to attend religious activities during

work hours, without loss of pay or leave time, while reprimanding Plaintiff for leaving work early, even for documented medical appointments.

Though Plaintiff may believe otherwise, the undisputed evidence indicates that though Mr. Crowfis did leave the office during work hours on occasion to attend church activities, he always requested and received approval to use annual leave time to do so. At his deposition and in his declaration, Plaintiff argues that Mr. Crowfis could not possibly have been using official leave time to attend church functions because he took annual vacation time in three and four week blocks. (*See* Menes Decl. ¶ 39; Menes Dep. 214–16.) Even if accepted as true, Plaintiff's observation that Mr. Crowfis took vacation time in three or four week blocks does not permit an inference that Mr. Crowfis did not use leave time when he left work for religious functions. Plaintiff offers no evidence regarding when or how often Mr. Crowfis took vacation, the amount of leave time Mr. Crowfis had accumulated, or the frequency with which Mr. Crowfis attended church activities during work hours. Without such evidence, Plaintiff's assertion is mere conjecture.

Plaintiff contends that the following exchange from Mr. Crowfis's deposition raises an issue of fact regarding whether Mr. Crowfis used leave time when he left the office to attend church functions:

Q: Do you ever have occasion to take personal leave time from the office?

A: Personal leave?

Q: Yes.

A: No, I've taken vacation and scheduled holidays.

(Crowfis Dep. 12.)  There is no evidence that Hunter College offered its employees a category of leave time called "personal leave."  (*See* Matis Decl. Ex. C.)  Rather, the evidence indicates that all leave time, including vacation time, was categorized as "annual leave."  (*See id.*)  Plaintiff acknowledges as much when he argues that Mr. Crowfis could not have used leave time to attend church events because he used large amounts of his leave time to travel or "go places."  (Menes Dep. 214–16.)  Given this context, Mr. Crowfis's reference to "vacation" must be understood as a reference to "annual leave" time, which the undisputed evidence indicates Mr. Crowfis used on numerous occasions to attend funerals.  (Matis Decl. Ex. C.)  Therefore, this testimony does not contradict Ms. Matis's unrebutted testimony that Mr. Crowfis never left the office to attend church activities without using annual leave time.

### C.      Conditions Giving Rise to an Inference of Discrimination

Even assuming Plaintiff had offered evidence that Mr. Crowfis attended religious functions without using leave time and that he did so with Defendants' knowledge and/or approval, Plaintiff's claim would still fail because there is no evidence of differential treatment—the basis for Plaintiff's allegation of discrimination.  Plaintiff testified that he never requested to leave work for religious functions and that he was unaware whether any other employees had done so.  Therefore, even if Mr. Crowfis had been given special privileges to leave work for religious functions (and Plaintiff has offered no evidence that this occurred), Plaintiff has not demonstrated that Defendants treated him or any other employee differently, let alone that they did so with discriminatory intent.

Because Plaintiff has not offered evidence that he was a victim of an adverse

employment action or that Defendants acted with discriminatory intent, the Court grants

Defendants' motion for summary judgment on Plaintiff's Title VII claim.[18]


**VI.     Plaintiff's State and City Law Claims**

The Court has dismissed all of Plaintiff's federal claims, leaving only claims

asserted under New York State and New York City law. Pursuant to 28 U.S.C. § 1367(c),

the Court may decline to exercise pendent jurisdiction over these claims. *See United*

*Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal

claims are dismissed before trial, . . . the state claims should be dismissed as well.");

*Sadallah v. City of Utica*, 383 F.3d 34, 39–40 (2d Cir. 2004) (citing *Gibbs* in directing

district court to enter judgment for defendants on federal law claims and to dismiss any

state law claims without prejudice); *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305

(2d Cir. 2003) ("'[I]n the usual case in which all federal-law claims are eliminated before

trial, the balance of factors to be considered under the pendent jurisdiction doctrine—

judicial economy, convenience, fairness, and comity—will point toward declining to

exercise jurisdiction over the remaining state-law claims.'") (quoting *Carnegie-Mellon*

---

[18] Plaintiff also asserts causes of action for religious discrimination under New York State Human Rights Law (Am. Compl. ¶¶ 86, 88) and New York City Human Rights Code (Am. Compl. ¶¶ 90, 92). As discussed *infra*, the Court declines to exercise supplemental jurisdiction over these claims. However, the standard for assessing liability under these state and city statutes is the same as that used under Title VII. *See, e.g., Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 n.3 (N.Y. 2004); *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) ("New York courts examine [discrimination] claims under [New York State and New York City law] with the same analytical lens as corresponding Title VII-based claims."); *Ferraro v. Kellwood Co.*, 440 F.3d 96, 99 (2d Cir. 2006) ("The standards for liability under these laws are the same as those under the equivalent federal antidiscrimination laws."). In light of the foregoing analysis of Plaintiff's Title VII claim, the Court has serious doubts about whether Plaintiff would be acting in good faith if he were to pursue his non-federal claims for religious discrimination in state court.

*Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Accordingly, Plaintiffs' remaining state and city law claims are dismissed without prejudice.

## CONCLUSION

For the reasons discussed herein, Defendants' motion for summary judgment **[30]** is granted. The clerk of the court is requested to close this case.

SO ORDERED.

Dated: New York, New York
       September 25, 2008

Richard J. Holwell
United States District Judge